United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 13, 2003**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

---

m 02-30540

---

IN THE MATTER OF:

MONUMENTAL LIFE INSURANCE COMPANY,
INDUSTRIAL LIFE INSURANCE LITIGATION.

MATTIE BRATCHER, ET AL.,

Plaintiffs,

MATTIE BRATCHER; JOHN BRATCHER;
CAROLINE BROWN,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED;
MARY SUE TRUESDALE;
MAXINE CASH,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED;
MILDRED BUFORD,
ALSO KNOWN AS MILDRED GAMLIN,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs-Appellants,

VERSUS

NATIONAL STANDARD LIFE INSURANCE COMPANY, ET AL.,

Defendants,

MONUMENTAL LIFE INSURANCE COMPANY,

Defendant-Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF:

UNITRIN, INC.,
INDUSTRIAL LIFE INSURANCE LITIGATION.

ROSIE LEE COTHRAN, ET AL.,

Plaintiffs,

ELIZABETH WALKER,

Plaintiff-Appellee,

VERSUS

SECURITY INDUSTRIAL INSURANCE COMPANY, ET AL.,

Defendants,

MONUMENTAL LIFE INSURANCE COMPANY,

Defendant-Appellee.

2

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF:

AMERICAN NATIONAL INSURANCE COMPANY,
INDUSTRIAL LIFE INSURANCE LITIGATION.

ROSE MARY ROACH,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff-Appellant,

VERSUS

AMERICAN NATIONAL INSURANCE COMPANY,

Defendant-Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN THE MATTER OF:

WESTERN & SOUTHERN LIFE INSURANCE CO.,
INDUSTRIAL LIFE INSURANCE LITIGATION.

JOSEPH BELL, ETC., ET AL.,

Plaintiffs,

JOSEPH BELL,
INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED;
WILLA ELLIS, DOCTOR;
THELMA WALKER OATIS,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED;
ALMA HYDE,

Plaintiffs-Appellants,

VERSUS

WESTERN & SOUTHERN LIFE INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
MDL Docket No. 1371,
Consolidated with No. 1391 and No. 1395
_____

4

Before SMITH, DENNIS, and CLEMENT,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In what may be the ultimate negative value class action lawsuit,[1] plaintiffs challenge defendants' alleged practice of paying lower benefits and charging higher premiums to blacks in the sale of low-value life insurance. The district court denied plaintiffs' motion to certify a class pursuant to FED. R. CIV. P. 23(b)(2), finding, *inter alia*, that the majority of class members would not benefit from injunctive relief. Based primarily on *Allison v. Citgo Petroleum Co.*, 151 F.3d 402 (5th Cir. 1998), we reverse and remand.

I.

This is a consolidation of civil rights actions against three life insurance companies: Monumental Life Insurance Company ("Monumental"), American National Insurance Company ("ANICO"), and Western and Southern Insurance Company ("Western and Southern"). Plaintiff policyowners, all of whom are black, allege that, for decades, defendants discriminated against them in the sale and administration of low-value life insurance policies, known as industrial life policies,[2] that have face amounts of $2000 or less and require small weekly or monthly premiums. Defendants comprise over 280 companies that issued industrial life policies over a fifty- to sixty-five-year period.[3]

Plaintiffs allege two overtly discriminatory practices. First, they accuse defendants of placing blacks in industrial policies offering the same benefits as do policies sold to whites, but at a higher premium (dual rates). Second, defendants allegedly placed blacks in specially-designed substandard industrial policies providing fewer or lower benefits than do comparable plans sold to whites (dual plans). These practices are memorialized in the insurer's rate books and records, which explicitly distinguish dual rate and dual plan policies by race.[4] Although, before filing their motion for class certification, plaintiffs challenged the insurers' alleged practice of charging blacks substandard premiums because of non-racial underwriting factors, such as mental condition, occupation, socioeconomic status, educational level, living conditions, and personal habits, plaintiffs no longer complain of such pretextual

---

[1] A "negative value" suit is one in which class members' claims "would be uneconomical to litigate individually." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 809 (1985); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).

[2] Defendants defend this practice on the basis that (1) the race-distinct pricing was justified; (2) the practice was approved by regulators; (3) the racially discriminatory policies were no more profitable than were those sold to whites; and (4) some
(continued...)

[2](...continued)
of the discriminatory policies were remediated.

[3] Over the years, defendants have acquired other insurance companies and thereby assumed blocks of in-force insurance policies issued by them. Monumental currently administers policies issued by 200 different companies, while Western and Southern administers policies issued by approximately 80 companies. ANICO has assumed an indeterminate number of in-force policies.

[4] As an example, a 1962 ANICO rate book shows that, for a twenty-year-old black, a $500 "20 Pay Life" industrial policy charged a weekly premium of $0.41, while a twenty-year-old white paid only $0.32.

underwriting procedures.

Defendants state that they issued "hundreds, perhaps thousands, of different industrial life insurance products" encompassing a countless variety of underwriting standards. It is undisputed that all companies that sold dual rate or dual plan policies have not done so since the early 1970's. Also, as early as 1988, some insurers voluntarily adjusted premiums and/or death benefits to equalize the amount of coverage per premium dollar. Still, plaintiffs estimate that over 4.5 million of the 5.6 million industrial policies issued by defendants remain in-force; many other policies have been terminated, surrendered, or paid-up without remediation.[5] Defendants' expert estimates that the ratio of terminated policies to outstanding policies is approximately five to one, meaning that slightly more than one million policies remain in-force.

Plaintiffs sued for violations of 42 U.S.C. §§ 1981 and 1982, seeking (1) an injunction prohibiting the collection of discriminatory premiums, (2) reformation of policies to equalize benefits, and (3) restitution of past premium overcharges or benefit underpayments. Pursuant to 28 U.S.C. § 1407, the Judicial Panel for Multidistrict Litigation ("MDL") consolidated the actions against Monumental and transferred them to the Eastern District of Louisiana for pretrial proceedings. Later, the MDL Panel took the same action with the cases against ANICO and Western and Southern.

Plaintiffs moved for certification of a class

pursuant to rule 23(b)(2), requesting that class members be provided notice and opt-out rights. The district court denied certification, finding that plaintiffs' claims for monetary relief predominate over their claims for injunctive relief, making rule 23(b)(2) certification inappropriate. The court also found that, given the large number of companies and policies involved, individualized hearings were necessary to determine damages and whether claims were barred by the statute of limitations. Defendants sought, and this court granted, interlocutory review pursuant to FED. R. CIV. P. 23(f).

II.

Defendants contend that class members cannot be readily identified by way of the class definition. A precise class definition is necessary to identify properly "those entitled to relief, those bound by the judgment, and those entitled to notice." 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21[6], at 23-62.2 (3d ed. 2003); *see DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). Some courts have stated that a precise class definition is not as critical where certification of a class for injunctive or declaratory relief is sought under rule 23(b)(2).[6] Where notice and

_____

[5] Plaintiffs allege that Monumental has not adjusted any of its dual rate or dual plan policies. ANICO adjusted one of its four discriminatory "Standard No. 3 plans.

[6] *See Battle v. Commonwealth*, 629 F.2d 269, 271 n.1 (3d Cir. 1980) ("Where . . . the class action seeks only injunctive or declaratory relief, for which the notice provision of Fed. R. Civ. P. 23-(c)(2) is not mandatory, the district court has even greater freedom in both the timing and specificity of its class definition."); *Rice v. City of Philadelphia*, 66 F.R.D. 17, 19 (E.D. Pa. 1974) ("[T]he precise definition of the [(b)(2)] class is relatively unimportant. If relief is granted to the plaintiff class, the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance
(continued...)

opt-out rights are requested, however, a precise class definition becomes just as important as in the rule 23(b)(3) context.

Plaintiffs sought to certify a class comprised of "[a]ll African-Americans who own, or owned at the time of policy termination, an industrial life insurance policy that was issued as a substandard plan or at a substandard rate." Defendants argue that the plain language of that definition does not comport with the class plaintiffs seek to certify. As we have noted, before moving for certification plaintiffs had included not only blacks who had purchased dual rate or dual plan policies, but also blacks who allegedly were forced into substandard plans, or forced to pay substandard rates, through the use of non-racial underwriting factors.

In their motion for certification, plaintiffs narrowed the class, stating that "[t]he proposed class *does not* include those who may have been subjected to covert socio-economic forms of racial discrimination." Plaintiffs specified that "the term 'substandard' applies to overt race-distinct dual premiums and plans, not to policies called substandard because of other factors such as socio-economic underwriting." We agree with defendants' observation that, as written, the class definition includes all blacks who paid substandard rates or were issued substandard plans. The definition makes no distinction between class members who purchased dual rate or dual plan policies and those forced into substandard rates or substandard plans through the use of pretextual underwriting practices. In other words, one must look to the certification motion for an adequate description of the proposed class.

Holding plaintiffs to the plain language of the class definition would be overly formalistic. In the first place, the district court, in denying certification, apparently did not consider the pretextual claims as part of the proposed class. Though referring to the "mass of policies involved" and the "differing underwriting practices among some 280 companies," the court stated that in calculating damages, individualized hearings were necessary to account for the idiosyncracies of each policy. At no point did the court suggest that individualized hearings were necessary to determine liability, as would be necessary if pretextual underwriting claims were part of the class.

Second, holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition. District courts are permitted to limit or modify class definitions to provide the necessary precision.[7] If the class is certified on remand, we trust that the plaintiffs or district court will amend the definition accordingly.

Defendants also argue that the definition terms "own, or owned," "industrial life insurance policy," "substandard plan," and "sub-

---

[6](...continued)

. . . .").

---

[7] *See, e.g.*, *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 659 (N.D. Ill. 1989) ("[I]t is certainly within this court's discretion to limit or redefine the scope of the class."); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class.") (citations omitted).

standard rate" are ambiguous, further complicating identification of class members. This argument, too, is overly formalistic. *See Forbush*, 994 F.2d at 1105-06.

Plaintiffs' filings in the district court clarified any ambiguities by stating that "the class is limited to industrial policies sold at a substandard (i.e., higher) rate for African-Americans and a lower rate for Caucasians, or as a substandard plan (i.e., a more costly plan) for African-Americans and a corresponding less expensive plan for Caucasians." Plaintiffs define industrial life insurance policies as "(1) policies labeled as 'industrial' or (2) those policies with a face amount of less than $2,000.00 and weekly or monthly home premium collection." Defendants were provided adequate notice and discovery by which to argue that the narrowed class cannot be certified pursuant to rule 23(b)(2).

## III.

We review for abuse of discretion the denial of class certification. *Jenkins v. Raymark Indus.*, 782 F.2d 468, 471-72 (5th Cir. 1986). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Allison*, 151 F.3d at 408. We review *de novo* however, the question whether the district court applied the correct legal standard. Forbush, 994 F.2d at 1104.

All classes must satisfy the four baseline requirements of rule 23(a): numerosity, commonality, typicality, and adequacy of representation.[8] FED. R. CIV. P. 23(a). Assuming these requirements are satisfied, a rule 23(b)(2) class may be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Plaintiffs premise rule 23(b)(2) certification on their request for an injunction prohibiting the further collection of discriminatory premiums.

### A.

The court observed that "many" proposed class membersSSthose whose policies have lapsed, those whose policies have already been voluntarily adjusted by defendants, and those whose death benefits already have been paidSSwould not benefit from injunctive relief. The court concluded that "this is a case in which individuality overrides any bland group-think, and money becomes the prime goal . . . not injunctive relief." Rule 23(b)(2) certification is improper, the court held, where the class's request for injunctive relief merely serves as a bootstrap for a claim of monetary damages.

In *Allison*, we carefully explained the statement in the advisory committee notes that rule 23(b)(2) certification "does not extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages." FED. R. CIV. P. 23 advisory committee notes (emphasis added).[9] *Allison* did not hold,

---

[8] The district court noted that "oral argument unveiled serious adequacy of representation is-
(continued...)

[8](...continued)
sues," but did not rely on this basis in denying certification.

[9] *Allison,* 151 F.3d at 411-12 ("The Advisory Committee Notes make no effort to define or explain the concept. Interpreting the term literally,
(continued...)

as the district court believed, that monetary relief predominates where it is the "prime goal" or a mere bootstrap to injunctive relief. Instead, "determining whether one form of relief actually predominates in some quantifiable sense is a wasteful and impossible task that should be avoided." *Allison*, 151 F.3d at 412 (citing 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1775, at 470 (2d ed. 1986)). In other words, certification does not hinge on the subjective intentions of the class representatives and their counsel in bringing suit.[10]

Instead, *Allison* looked to the nature of the rule 23(b)(2) device in defining when monetary relief predominates. That rule's focus on injunctive and declaratory relief presumes a class best described as a "homogenous and cohesive group with few conflicting interests among its members." *Id.* at 413. Class certification centers on the defendants' alleged unlawful conduct, not on individual injury. Once monetary damages enter the picture, however, class cohesiveness is generally lost, because

"[m]onetary remedies are more often related directly to the disparate merits of individual claims." *Id.* (citations omitted). Where the need to address the merits of individual claims requires separate hearings, the efficiency gained by class litigation is lost.

In *Allison*, therefore, we held, *id.* at 415, that monetary relief, to be viable in a rule 23(b)(2) class, must "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." Monetary relief must be incidental, meaning that it is "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."[11] *Id.* Additional hearings to resolve "the disparate merits of each individual's case" should be unnecessary. *Id.*

Of course, rule 23(b)(2) certification requires the defendants' conduct to be ongoing such that injunctive relief will benefit at least some class members. In *Bolin v. Sears Roebuck & Co.*, 231 F.3d 970, 972 (5th Cir. 2000), we purported to apply *Allison* to a proposed rule 23(b)(2) class of one million consumers who alleged that the defendant had employed various illegal practices to coerce payment of otherwise-discharged pre-bankruptcy debt. We observed that "[m]ost of the class consists of individuals who do not face further harm from Sear's [*sic*] actions." *Id.* at 978. In fact, *only one* class member who might benefit from injunctive relief was

---

[9](...continued)
predominant means 'controlling, dominating, [or] prevailing.' But how that translates into a workable formula for comparing different types of remedies is not at all clear.") (citation omitted).

[10] *But see Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003) (expressly rejecting *Allison* and instead "focus[ing] on the language of Rule 23(b)(2) and the intent of the plaintiffs in bringing the suit"); *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 163-64 (2d Cir. 2001) (stating that rule 23(b)(2) certification is appropriate only where "reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought" and "the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits").

[11] The predomination requirement serves two basic purposes, namely the interests of class members who may wish to pursue monetary claims individually, and interests of judicial economy. *Allison*, 151 F.3d at 415.

9

identified. *Id.*[12]

Here, by contrast, even defendants' expert estimates that one million dual rate or dual plan policies remain in-force.[13] The exact number of class members continuing to pay discriminatory premiums is unknown, but we are willing to assumeSSwithout contrary evidence from defendantsSSthat the number exceeds the *de minimis* standard set by *Bolin.*

### B.

To the extent that *Bolin* misinterprets *Allison* by conditioning certification on the number of class members that will "truly benefit" from injunctive relief, it reflects a concern that plaintiffs may attempt to "shoehorn damages actions into the Rule 23(b)(2) framework, depriving class members of notice and opt-out protections."[14] Indeed, we suggested in *Allison* , 151 F.3d at 413, that monetary relief may predominate "when its presence in the litigation suggests that the procedural safeguards of notice and opt-out are necessary." Defendants seize on this point, arguing that plaintiffs' request for notice and opt-out is a tacit admission that rule 23(b)(2)

certification is inappropriate. This ignores the discretion given a district court to order notice and opt-out rights when certifying a rule 23-(b)(2) class. *See* FED. R. CIV. P. 23(d)(2).

As "fundamental requisites of the constitutional guarantees of procedural due process," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), notice and opt-out are mandatory for damage classes certified under rule 23(b)(3). Though rule 23 does not explicitly extend these safeguards to rule 23(b)(2) classes, due process requires the provision of notice where a rule 23(b)(2) class seeks monetary damages.[15]

On the other hand, there is no absolute right of opt-out in a rule 23(b)(2) class, "even where monetary relief is sought and made available." *Penson*, 634 F.2d at 994; *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 605-07 (5th Cir. Jan. 1981). Under our precedent, should the class be certified on remand, class members must be provided adequate notice, and the district court should consider the possibility of opt-out rights.[16]

---

[12] When the class action was filed, the defendant was suing one of the class members in state court. Although defendant abandoned the suit, the court raised the possibility that the controversy had not been mooted. *Bolin*, 231 F.3d at 978 n.46.

[13] As noted, plaintiffs' expert contends that 4.5 million of the 5.6 million industrial life insurance policies issued by defendants remain in-force.

[14] *Bolin*, 231 F.3d at 976; *see also McManus v. Fleetwood Enters.*, 320 F.3d 545, 554 (5th Cir. 2003) ("[C[]lass members would potentially receive a poor substitute for individualized money damages, without the corresponding notice and opt-out benefits of Rule 23(b)(3) . . . .").

[15] *Allison*, 151 F.3d at 412 n.4 (citing *Johnson v. Gen. Motors Corp.*, 598 F.2d 432, 436-38 (5th Cir. 1979)); *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir. Unit B Jan. 1981). The type of notice afforded to rule 23(b)(2) class members seeking monetary relief will not always be "equivalent to that required in (b)(3) actions." *Johnson*, 598 F.2d at 438.

[16] *See Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) (contemplating the use of opt-out rights for a rule 23(b)(2) class); *Eubank v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997) (holding that the language of rule 23 is sufficiently flexible to afford district courts the discretion to grant opt-out rights for rule 23(b)(2) (continued...)

10

*Allison*'s statement that monetary relief may predominate where notice and opt-out are necessary reflects only the inescapable fact that such safeguards are most appropriate where individual issues diminish class cohesiveness. Then, conflicts among class members and issues of adequate representation are most likely to surface. Rule 23(b)(3) is the default vehicle for certification, but only because notice and opt-out rights are mandatory components. A district court is empowered by rule 23(d)(2) to provide notice and opt-out for any class action, so rule 23(b)(2) certification should not be denied on the mistaken assumption that a rule 23(b)(3) class is the only means by which to protect class members.[17]

All of this further demonstrates the futility of the district court's and dissent's inquiry as to whether the "prime goal" of the class is injunctive or monetary relief. The rule 23(b)(2) predominance requirement, by focusing on un-

iform relief flowing from defendants' liability, "serves essentially the same functions as the procedural safeguards and efficiency and manageability standards mandated in (b)(3) class actions." *Allison*, 151 F.3d at 414-15. Therefore, to deny certification on the basis that the damage claims would be better brought as a rule 23(b)(3) class serves no function other than to elevate form over substance.[18] Indeed, interests of judicial economy are best served by resolving plaintiffs' claims for injunctive and monetary relief together.

IV.

Applying *Allison*'s predominance test, the district court determined that the requested monetary relief does not flow from liability to the class as a whole. The court stated that "many and a variety of hearings would be required to determined personalized harm to each individual plaintiff because of the mass of policies involved, differing underwriting practices among some 280 companies, differing built-in benefits, account dividends, and age at policy issuance."

---

[16](...continued)
classes).

[17] One of the dissent's two reasons for finding class certification inappropriate concerns our supposed "suggestion" that notice and opt-out rights are necessary. In *Allison*, 151 F.3d 414, however, we explained that "[t]he fact that the predomination requirement serves to protect the rights of class members . . . does not imply . . . that the availability of monetary relief in a (b)(2) class action depends solely or directly on whether class members are entitled to notice or opt-out rights." As mentioned, this court's precedent requires that notice be provided where a rule 23(b)(2) class seeks damages, *see supra* note 15, so it is circular for the dissent to argue notice as a basis for denying certification. Our direction to the district court to consider the possibility of opt-out rights speaks nothing as to whether such rights are necessary or even desirable.

---

[18] Our view that the rule 23(b)(2) and (b)(3) devices may work in tandem is strengthened by the roots of subdivision (b)(2), which was added "to Rule 23 in 1966 primarily to facilitate the bringing of class actions in the civil rights area." 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1775, at 470 (2d ed. 1986). Before its adoption, the rules made no explicit reference to class actions involving injunctive or declaratory relief, and "there was some uncertainty whether a class action seeking one of those remedies was an appropriate device for vindicating civil rights." *Id.* at 470-71. Rule 23(b)(2) was adopted to facilitate the use of injunctive relief, not to compartmentalize claims for damages under rule 23(b)(3).

### A.

Plaintiffs contend they seek equitable restitution in the form of a constructive trust for class members who no longer have in-force policies. By characterizing this relief as equitable, plaintiffs hope to demonstrate that that that relief is inherently compatible with rule 23(b)(2) certification, thereby avoiding *Allison*'s monetary predominance inquiry. Defendants argue that plaintiffs, who never used the term "constructive trust" in the district court, are trying to "re-package" their straightforward request for damages.

Equitable monetary relief is compatible with a rule 23(b)(2) class.[19] Importantly, this pronouncement has been limited to the context of title VII backpay, a remedy designated by statute as "equitable." 42 U.S.C. § 2000e-5(g)(1); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 n.4 (2002). Backpay is therefore unique in that it is "an integral component of Title VII's 'make whole' remedial scheme." *Allison*, 151 F.3d at 415; *see also Johnson v. Ga. Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir. 1969). Not coincidentally, as compared to compensatory damages, "calculation of back pay generally involves less complicated factual determinations and fewer individual issues." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir. 2002). In *Allison*,

151 F.3d at 415, we recognized that, for this reason, backpay generally does not predominate over injunctive or declaratory relief.

It would be mistaken to presume that because backpaySSa remedy readily calculable on a classwide basisSSis compatible with a rule 23(b)(2) class, any other remedy designated as equitable may automatically piggyback a claim for injunctive relief. To be sure, equitable monetary remedies are less likely to predominate over a class's claim for injunctive relief, but this has more to do with the uniform character of the relief rather than with its label. Therefore, rather than decide whether plaintiffs' claim for restitution is legal or equitable in nature, we apply *Allison* and examine whether the claim predominates over the request for injunctive relief.

### B.

This is not a case in which class members are entitled to a one-size-fits-all refund; assuming liability is established, individual damages will depend on the idiosyncracies of the particular dual rate or dual plan policy. For example, the age at which a class member purchased a dual rate policy will have an impact on how long the insured paid premiums and consequently on the amount of damages. Some policies contain built-in benefits covering occurrences outside of death, such as loss of limb; others pay periodic dividends. As we have observed, some defendants, beginning in 1988, voluntarily adjusted premiums and benefits for some policies sold on a race-distinct basis.

Plaintiffs propose using standardized formulas or restitution grids to calculate individual class members' damages. Defendants counter that "thousands" of grids

---

[19] *See Allison*, 151 F.3d at 415-16 ("If the instant case involved only claims for equitable monetary relief, *Pettway* [*v. Am. Cast. Iron Pipe Co.*, 494 F.2d 211, 257 (5th Cir. 1974)] would control. *Pettway*, however, did not address the availability in (b)(2) class actions of other forms of monetary relief, such as compensatory and punitive damages . . . ."); *Pettway*, 494 F.2d at 257 ("All that need be determined is that conduct of the party opposing the class is such as makes such equitable relief appropriate.").

must be constructed to account for the myriad of policy variations. That may be so, but the monetary predominance test does not contain a sweat-of-the-brow exception. Rather, we are guided by its command that damage calculation "should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Allison*, 151 F.3d at 415.

In the list of policy variables cited by defendants and the district court, none requires the gathering of subjective evidence.[20] This is not, for example, like *Allison*, a title VII case in which class members' claims for compensatory and punitive damages necessarily "implicate[] the subjective differences of each plaintiff's circumstances." *Id.* at 417. Rather, assuming that unlawful discrimination is found, class members automatically will be entitled to the difference between what a black and a white paid for the same policy. Not coincidentally, such damages flow from liability in much the same manner that an award of backpay results from a finding of employment discrimination. *Pettway*, 494 F.2d at 256-58.

We are well aware that, as *Allison* qualifies, 151 F.3d at 415, the calculation of monetary damages should not "entail complex individualized determinations." Although it is arguable that the construction of thousands of restitution grids, though based on objective data, involves the sort of complex data manipulations forbidden by *Allison*, we read *Allison* to the contrary. The policy variables are identifiable on a classwide basis and, when sorted, are capable of determining damages for individual policyowners; none of these variables is unique to particular plaintiffs.[21] The prevalence of variables common to the class makes damage computation "virtually a mechanical task." *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 326-27 (5th Cir. 1978) (quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977)).[22]

---

[20] Had plaintiffs not limited their proposed class to dual rate and dual plan policies, individual hearings would be necessary to determine whether pretextual underwriting practices were used to force the respective class members into substandard plans. In that instance, we agree with the district court that the large number of defendants and underwriting practices would be relevant to finding the predominance of monetary damages.

[21] In this sense, the instant case is unlike *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 744-45 (5th Cir. 2003), in which we found monetary damages predominant in a proposed rule 23(b)(3) class alleging violations of Texas's statute prohibiting the unauthorized practice of law. Non-lawyers were alleged to have used "legal skill or knowledge" in the preparation of mortgage closing documents. Whether certain practices by the non-lawyers violated the statute was determinable on a classwide basis; we explained, however, that monetary damages predominated, because the extent of these practices varied by transaction, and plaintiffs were entitled to a refund only for those practices that violated the statute. Therefore, *each* transaction had to be dissected to determine the extent of liability and damages.

[22] One is left wondering in what circumstances (if any) the dissent would permit monetary damages in a rule 23(b)(2) class. Remarkably, the dissent makes no attempt to explain its view that insurance policy factors such as premium rate, issue age, and benefits paid are based on "intangible, subjective differences." *Allison*, 151 F.3d at 415. Instead, *Allison*'s statement that damages be "capable of computation by means of objective standards" is ideal for refund-type cases such as this, in which damages are calculable using

(continued...)

Finally, defendants' records contain the information necessary to determine disparities between, on the one hand, dual rate and dual plan policies, and on the other hand, plans sold to whites. Damage calculations do not require the manipulation of data kept outside defendants' normal course of business. Defendants' complaints to the contrary are belied by the fact that, since 1988, many policies have been adjusted to account for racial disparity.

V.

As noted, defendants have not sold dual plan or dual rate policies since the 1970's; some class members purchased their policies as far back as the 1940's. The district court denied certification also on the basis that individualized hearings are necessary to determine expiration of the statute of limitations for particular sets of policies. The predominance of individual issues necessary to decide an affirmative defense may preclude class certification. *Castano*, 84 F.3d at 744. Limitations is an affirmative defense. FED. R. CIV. P. 8(c); 2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 8.07[1], at 8-34 (3d ed. 2003).

Although, under §§ 1981 and 1982, state law governs the substantive limitations period, federal law determines when the period accrues. *Perez v. Laredo Junior Coll.*, 706

F.2d 731, 733 (5th Cir. 1983). It commences when the plaintiff either has actual knowledge of the violation or has knowledge of facts that, in the exercise of due diligence, would have led to actual knowledge.[23] State law may further toll the running of limitations. *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993).

Doubtless most class members, the majority of whom are poor and uneducated, remain unaware of defendants' discriminatory practices. Of the thirteen representative plaintiffs, defendants point to only one, Jo Ella Brown, whose claim may have expired because of actual knowledge of defendants' practices.

To hold that each class member must be deposed as to precisely when, if at all, he learned of defendants' practices would be tantamount to adopting a *per se* rule that civil rights cases involving deception or concealment cannot be certified outside a two- or three-year period.[24] *Waste Mgmt. Holdings, Inc.*, 208 F.3d 288,

---

[22](...continued) factors developed and maintained in the course of defendants' business. *Id.* The dissent evidently would limit damages in rule 23(b)(2) classes to instances in which there is no variance among the "specific characteristics of each policy and policyholder," a standard that necessarily would require that each class members' damages be identical. It is safe to say that the dissent's novel approach is unsupported by caselaw.

[23] *E.g.*, *Harris v. Hegmann*, 198 F.3d 153, 156-57 (5th Cir. 1999); *Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir. 1988).

[24] The district court's reliance on *Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998), is misplaced. The proposed class, all smokers before age nineteen, brought medical monitoring claims against defendant tobacco companies. The court, *id.* at 149, determined that individual issues existed as to the accrual of the statute of limitations, which required a determination for each plaintiff as to when "he began smoking and how much he has smoked since then." By definition, the limitations period had commenced for each and every class member. Here, accrual of the statute of limitations is premised on defendants' common practice of concealment, so a presumption of unawareness by the plaintiff class is warranted.

296 (1st Cir. 2000). Such a result would foreclose use of the class action device for a broad subset of claims, a result inconsistent with the efficiency aims of rule 23. Though individual class members whose claims are shown to fall outside the relevant statute of limitations are barred from recovery, a rebuttable presumption that the class lacks knowledge of defendants' concealment is warranted at the class certification stage.

Instead, defendants rely on a theory of constructive notice, arguing that widespread media reporting of the issue over the last several decades should have "excite[d] the inquiry of a reasonable person." *Conmar Corp. v. Mistui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1998). Where events receive "widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980); *In re Beef Antitrust Indus. Litig.*, 600 F.2d 1148, 1170 (5th Cir. 1979). The district court believed constructive notice to be an individual issue, or at least a regional one, stating that "whether a plaintiff in Michigan, as compared to a plaintiff in Louisiana, had constructive notice, is a fact issue which needs to be determined individually and not on a classwide basis."

Whether the media reports were sufficiently publicized so as to provide constructive notice is an issue reserved for the merits. Our analysis is limited to whether this issue is determinable on a classwide basis. Had defendants provided evidenceSSor even allegedSSthat media treatment of this issue was more prevalent in some regions of the country than in others, the district court's observation that individualized hearings are required to determine the geographic reach of constructive notice might be sustainable.

The requirement of "widespread publicity," *McGovern*, 621 F.2d at 154, suggests, however, that the appropriate frame of reference is the national media market, at least for issues of national importance. Several publications listed by defendants, including the *Washington Post*, the *Wall Street Journal*, and *USA Today*, are available throughout the United States, and although many other publications are local newspapers, that fact is entirely consistent with national treatment of the issue. Neither the district court nor defendants give good reason for geographically splicing constructive notice. We therefore have no difficulty concluding that whether plaintiffs were provided constructive notice is an issue that can be decided on a classwide basis.

The order denying class certification is REVERSED, and this matter is REMANDED for further proceedings consistent with this opinion. We express no view on the district court's ultimate decision whether to certify in light of today's opinion, nor do we opine on the ultimate merits of the substantive claims.

ENDRECORD
ENDRECORD

15

CLEMENT, Circuit Judge, dissenting:

Based on *Allison v. Citgo Petroleum Co.*, 151 F.3d 402 (5th Cir. 1998), and *McManus v. Fleetwood Enters.*, 320 F.3d 545 (5th Cir. 2003), the district court properly denied class certification to Plaintiffs.

Plaintiffs seek class certification under Rule 23(b)(2), which permits cases meeting the requirements of Rule 23(a) to be certified as class actions if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Unlike Rule 23(b)(1) or (b)(3), Rule 23(b)(2) "was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary." *Allison*, 151 F.3d at 412.

Rule 23(b)(2) is silent as to whether monetary remedies may be sought in conjunction with injunctive or declaratory relief, but the Advisory Committee Notes on Rule 23 state that class certification under (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Id.* at 411. Based on this language, the Fifth Circuit "neither allow[s] certification without regard to the monetary remedies being sought, nor restrict[s] certification to classes seeking exclusively injunctive or declaratory relief." *Id.* The key question is whether "the predominant relief sought is injunctive or declaratory." *Id.* at 411-412; *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 15 (2d Cir. 2003). The corresponding question is whether the monetary relief is incidental to the requested injunctive or declaratory relief.[25] *Allison*, 151 F.3d at 415. If injunctive or declaratory relief does not predominate (or if monetary relief is not incidental),

---

[25] Incidental damages are defined as those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief."*Id.*

16

class certification under Rule 23(b)(2) is inappropriate.[26] *Id.*

There are two circumstances in which Rule 23(b)(2) class certification is inappropriate. First, Rule 23(b)(2) does not provide for procedural safeguards like notice and opt-out rights, primarily because the class is presumed to be "homogenous and cohesive" due to "the *group* nature of the harm alleged and the *broad* character of the relief sought." *Id.* at 413 (emphasis added). Therefore, if notice and/or opt-out rights seem to be necessary, then certification under Rule 23(b)(2) may be inappropriate. *Id.* ("[M]onetary relief 'predominates' under Rule 23(b)(2) when its presence in the litigation suggests that the procedural safeguards of notice and opt-out are necessary.").

Second, Rule 23(b)(2) only permits monetary relief in the form of "uniform group remedies." *Id.* at 414; *McManus*, 320 F.3d at 554. Uniform group remedies are consistent with Rule 23(b)(2) for two reasons: (1) they are "capable of computation by means of objective standards," thus avoiding the need for "complex individualized determinations" and procedural safeguards like notice and opt-out rights; and (2) the group nature of the remedy ensures that the class remains "homogenous and cohesive."[27] *Allison*, 151 F.3d at 413, 415 (noting that "as claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases"). Therefore, Rule 23(b)(2) class certification is inappropriate where the monetary relief requires "a specific or

---

[26] Equitable monetary relief, such as back pay, is not subject to the *Allison* predomination test. *Allison*, 151 F.3d at 415-16 ("If the instant case involved only claims for equitable monetary relief, [*Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974)] would control. *Pettway*, however, did not address the availability in (b)(2) class actions of other forms of monetary relief, such as compensatory and punitive damages, nor did it have any occasion to do so.").

[27] Footnote 22 of the majority opinion misrepresents the meaning of the term "uniform group remedies". In a Rule 23(b)(2) class action, each class member does not need to receive the exact same amount of monetary relief. *Allison*, 151 F.3d at 415. However, the monetary relief awarded must be based on the "group nature of the harm alleged" rather than the individual harm suffered by each class member. *Id.* at 413, 415.

time-consuming inquiry into the varying circumstances and merits of each class member's individual case." *Id.*

Under the test articulated in *Allison*, it is clear that Rule 23(b)(2) class certification is inappropriate in this case. First, the majority opinion suggests that notice and opt-out rights are necessary: "Under our precedent, should the class be certified on remand, class members must be provided adequate notice, and the district court should consider the possibility of opt-out rights."

Second, a uniform group remedy is not possible in this case because Plaintiffs seek individualized remedies based on the specific characteristics of each policy and policyholder.[28] Plaintiffs concede that the "amount of the awards vary" based on "factors including the premium rates charged to African-Americans and Caucasians, the issue ages for each policy, and the benefits provided." Monetary relief in a Rule 23(b)(2) class action should not be "dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415; *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 n.22 (5th Cir. 2000) (stating that Rule 23(b)(2) was created to address "group, as opposed to individual[,] injuries"). Therefore, Rule 23(b)(2) class certification is inappropriate here.

Review of the record provides further evidence that Rule 23(b)(2) class certification is inappropriate. Plaintiffs seek: (1) an injunction prohibiting the collection of discriminatory premiums; (2) reformation of existing policies to equalize benefits; and (3) restitution of past premium overcharges or benefit overpayments. The parties appear to agree that: (1) the basis of Plaintiffs' suit is the issuance of hundreds of different industrial life insurance policies by several hundred

---

[28] Part IIIB of the majority opinion concedes that the individual issues in this case have diminished the cohesiveness of the class to the point where notice and opt-out rights are necessary.

Defendants over a period of 50 to 65 years; (2) Defendants ceased issuing such policies in the mid-1970s (or, at the latest, the early 1980s); (3) many, if not most, of the industrial life insurance policies are no longer in effect; and (4) a large number of the remaining policies have been modified to some extent by Plaintiffs or Defendants. In this light, the first and second remedies sought by Plaintiffs would seem to be of little consequence to many, if not most, Plaintiffs because the injunction and reformation would only affect those Plaintiffs who still hold industrial life insurance policies that have remained largely unaltered for over 20 years (and up to 75 years). For Plaintiffs who do not fit into this category, the only relief would be monetary in nature: the restitution of past premium overcharges or benefit overpayments.

In sum, the factual basis of Plaintiffs' suit indicates that injunctive or declaratory relief does not predominate and that the monetary relief is not incidental. *McManus*, 320 F.3d at 553-54 (concluding that the factual basis of plaintiffs' suit was "markedly different from the paradigm Rule 23(b)(2) class action," and thus class certification under Rule 23(b)(2) was inappropriate); *James v. City of Dallas*, 254 F.3d 551, 572 (5th Cir. 2001) (analyzing the factual basis of plaintiffs' suit and concluding that class certification was appropriate). As this Court stated in *McManus*, permitting this case to be certified under Rule 23(b)(2)

> would undo the careful interplay between Rules 23(b)(2) and (b)(3) [because] the class members would potentially receive a poor substitute for individualized money damages, without the corresponding notice and opt-out benefits of Rule 23(b)(3)[,] and defendants would potentially be forced to pay what is effectively money damages, without the benefit of requiring plaintiffs to meet the rigorous Rule 23(b)(3) requirements.

320 F.3d at 554. This Court should not allow plaintiffs "to shoehorn damages actions into the Rule

23(b)(2) framework" and thus blur the distinctions between the different types of class actions.[29]

*Bolin*, 231 F.3d at 976. Therefore, I respectfully dissent.

---

[29] Part IIIB of the majority opinion indicates that: (1) it is "futile" to inquire whether injunctive/declaratory or monetary relief predominates in a class action, and (2) "the [R]ule 23(b)(2) and (b)(3) devices may work in tandem," even when the plaintiffs have only sought certification under Rule 23(b)(2). In effect, the majority opinion suggests that courts are free to certify class actions as they wish, without regard to the character of the class action or the strictures of Rule 23. Such avoidance of the rules governing class certification contravenes both the intent of Rule 23 and the caselaw of this Court. *Allison*, 151 F.3d at 415 n.9 ("[O]ur cases have adopted the position taken by the Rule 23 advisory committee that monetary relief may not be sought in a (b)(2) class action if it predominates over the requested injunctive or declaratory relief."); *McManus*, 320 F.3d at 554.